IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MILTON JACKSON,<br><br>    Plaintiff,<br><br>v.<br><br>JO ANNE BARNHART,<br><br>    Defendant.<br>_____ / | No. C 02-02498 JSW<br><br>**ORDER GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

    Now before the Court is the motion of Plaintiff Milton Jackson ("Jackson") for summary judgment or remand and the cross-motion of the Commissioner of the Social Security Administration's ("Commissioner") for summary judgment. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the administrative record and considered the parties' papers and the relevant legal authority, the Court hereby DENIES Jackson's Motion for Summary Judgment and GRANTS the Commissioner's Cross-Motion for Summary Judgment.

**FACTUAL AND PROCEDURAL HISTORY**

    Jackson brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner denying his request for Social Security benefits. Jackson is a forty-nine year old male with a twelfth grade education. (Certified Transcript of Record Proceedings "Tr." at 7, 28, 170, 265.) He has previously worked as a certified nursing assistant, a security person, a truck driver, and a warehouse stock clerk. (Tr. at 170, 265.) Jackson claims disability due to degenerative disc disease, chronic low back pain, and depression. (Tr. at 28.)

Jackson alleges that, among other limitations, he is unable to stand or sit for longer than ten to fifteen minutes due to pain in his lower back and left leg, as well as numbness in his foot. (Tr. at 98-99.) In combination with his physical limitations, he also claims that he is unable to work because his depression impairs his memory, concentration and ability to complete tasks. (Tr. at 101, 160.)

On September 24, 1992, Jackson originally filed for disability insurance benefits, alleging a disability beginning December 18, 1991 due to back pain. (Tr. at 163-66.) Upon denial of benefits on both the initial and reconsideration applications, Jackson filed a request for hearing on March 24, 1993. (Tr. at 175-77, 186-87, 188.) On October 27, 1994, an Administrative Law Judge ("ALJ") determined that Jackson was disabled for a closed period between December 18, 1991 and February 1, 1993. (Tr. at 234-241.) The ALJ also determined that Jackson was not disabled as of February 2, 1993 because he was able to perform medium level work activity which was available in the national economy. (Tr. at 238-39.) Jackson did not timely appeal the decision and the 1994 findings became binding under res judicata.[1] Jackson subsequently filed a new application based on his low back pain for additional supplemental security income on February 8, 1995 (protective date) and additional social security disability insurance on July 12, 1995 (protective date), both of which were denied initially and upon reconsideration. (Tr. at 27, 250-53.)

Jackson's alleged disability was initially based on his physical impairment. (Tr. at 261.) On February 1, 1993, Dr. Keller stated an impression of multiple level degenerative disc disease, consistent with the impression from a January 28, 1992 magnetic reasonance imaging ("MRI") of Jackson's lumbar spine. (Tr. at 205, 212.) Dr. Keller also noted evidence of L5-S1 facet arthropathy and neural foraminal stenosis. (Tr. at 205.) On March 8, 1993, Dr. Paxton reviewed Jackson's records and noted a lack of evidence of any decrease in his range of motion. (Tr. at 213.) On June 11, 1994, Dr. Lincoln, an orthopedic consultant, found no objective signs or findings to explain Jackson's symptoms. (Tr. at 223-24.) Dr. Lincoln noted that the significance of the multilevel degenerative disc disease findings indicated in the 1992 MRI was

---

[1] *See Miller v. Heckler*, 770 F.2d 845, 848 (9th Cir. 1985).

limited absent supportive clinical findings because up to one-third of the population with no history of low back pain may show similar results. (Tr. at 224.) Dr. Lincoln noted that, based on his subjective complaints, Jackson could lift fifty pounds frequently and seventy-five pounds occasionally, with occasional stooping, crouching or crawling. (Tr. at 225-27.)

On November 7, 1994, while attending a family funeral in Virginia, Jackson went to the emergency room at Portsmouth General Hospital because he was out of pain medication. (Tr. at 283.) There, Dr. Rawls diagnosed Jackson with acute exacerbation of chronic low back pain, secondary to multilevel degenerative disc disease. (*Id*.)

On November 16, 1995, Dr. Sharma found that Jackson's low back pain was due to a musculoskeletal strain and muscle spasm. (Tr. at 290.) Dr. Sharma found that Jackson could walk and stand for an hour, and could sit for up to two hours at a time - sitting up to six hours a day total. (*Id*.) Additionally, Dr. Sharma noted that Jackson could lift twenty-five pounds frequently and fifty pounds occasionally, with occasional bending and stooping. (Tr. at 290-91.) Based on Dr. Sharma's consultation, on December 8, 1995, Dr. Newton noted the same exertional limitations in a Residual Physical Functional Capacity Assessment. (Tr. at 293-300.)

In 1996, Jackson was seen at both the Alameda County Medical Center Highland Hospital ("Highland") and the Hayward Medical Center ("Hayward"). (Tr. at 336-76.) On February 22, 1996, Jackson visited the walk-in clinic at Highland because his left fifth toe was painful, swollen, and discolored. (Tr. at 304.) He was diagnosed with occlusive vascular disease. (*Id*.) Dr. Williams evaluated an x-ray taken of Jackson's back, noting minimal generalized degenerative changes to the lumbosacral spine and no other abnormalities. (Tr. at 305, 365.) The Alameda County Social Services Agency reported that Jackson was capable of sedentary work, but could not lift over five pounds, and should not walk, climb, stand, kneel, or bend at the knee. (Tr. at 310.) On March 9, 1996, Highland referred Jackson for an urgent podiatry appointment regarding the pain and numbness in his toe. (Tr. at 345.) Dr. Eisenberg reviewed the radiology report and noted "no bony or significant soft tissue abnormality." (Tr. at 343.) On April 4, 1996, after a vascular exam, a Highland physician diagnosed him with left small toe discoloration and bilateral calf muscle spasms. (Tr. at 340.) On the same day, Dr.

3

1  Eile at Hayward reviewed Jackson's echocardiology report for sleep apnea and concluded
2  that he had an abnormal echocardiogram. (Tr. at 355.) On December 4, 1996, Jackson was
3  treated at Highland for acute low back strain. (Tr. at 339.) Hayward records indicate that on
4  December 6, 1996, Jackson needed an appointment "so that form can be filled out." (Tr. at
5  353.)

On March 25, 1997, San Francisco Department of Human Services completed a Triage Employability Assessment of Jackson, classifying him as unemployable due to permanent disability. (Tr. at 383-84.) The Triage worker noted Jackson's difficulty in making appointments, inability to sit for more than twenty to forty minutes or stand for more than twenty minutes, and difficulty walking more than one block. (Tr. at 384.) Jackson was subsequently screened into the SSI Service Center. (Tr. at 384, 514.)

On August 4, 1997, Dr. Anderson, a SSI Project physician, recommended a respite bed for Jackson because he suffered from chronic low back pain with degenerative disc disease at multiple levels and experienced left sciatica with pain radiating down the left leg to the foot. (Tr. at 393.) In his SSI Project report, Dr. Anderson diagnosed Jackson with chronic pain syndrome, likely the result of lumbosacral sprain or possible lumbar facet syndrome. (Tr. at 540.) Dr. Anderson recommended the following exertional limitations: occasional ten pound or frequent less-than-ten pound carrying or lifting; standing or walking for two hours in an eight hour workday with accommodations for hourly breaks; sitting less than six hours with regular breaks every hour; alternating between sitting and standing every one-to-two hours; driving a clutch to be avoided; and climbing, stooping, bending, crouching and crawling to be prohibited. (Tr. at 541-42.) Jackson presented a depressed mood and a guarded affect, but with a normal thought content and quality, with no serious memory deficits. (Tr. at 536.) Dr. Anderson noted a "psychiatric disorder of mood, rule out dysthymia versus major depression." (Tr. at 540.)

Jackson first raised mental impairment as a basis for disability in his request for hearing. (Tr. at 557, 563.) An ALJ vacated the previous reconsideration denial and remanded the case to the California State Agency for evaluation of Jackson's newly alleged mental disorder. (Tr. at 556-58.) In his August 11, 1997 SSI Project report, Dr. Neill, Ph.D., diagnosed Jackson with

major depression, severe, and possible dysthymic disorder, with Axis II paranoid traits. (Tr. at 519.) Jackson reported to Dr. Neill that he had been homeless since 1994, and that he had suicidal ideation beginning in January 1995 after his father's death. (Tr. at 516.) Dr. Neill noted that Jackson appeared to present himself as more functional than he really was. (Tr. at 517.) He was able to complete one-step operations but erred on one two-step and each three-step operation. (*Id*.) Dr. Neill assessed that Jackson was unable to attend to activities of daily living, including accepting direction of a supervisor. (Tr. at 519.) Dr. Neill concluded that Jackson had a psychological disability in addition to his reported physical impairments. (*Id*.) Dr. Neill also felt that Jackson would not be able to manage his own funds if granted benefits. (*Id*.) On August 26, 1997, Dr. Neill filed an addendum to his evaluation, re-phrasing his diagnosis as "major depression super imposed over chronic dysthymia with childhood onset as well as traits of the paranoid personality disorder." (Tr. at 522.)

On December 5, 1997, Jackson was evaluated by Dr. Backlund, Ph.D., a licensed psychologist. (Tr. at 588-90.) At that consultation, Jackson denied having been treated for severe depression. (Tr. at 588.) Dr. Backlund noted that Jackson appeared to be functioning at the low average range, and that his mood was depressed. (*Id*.) Dr. Backlund found Jackson's thinking clear, logical, and directed. (*Id*.) Dr. Backlund also noted that the testing results were suspect due to intentional deception. (Tr. at 589.) Jackson reported several daily activities to Dr. Backlund, including taking the bus, dressing himself, fixing meals, doing laundry, going shopping, watching television and listening to the radio. (Tr. at 588.) While Jackson's judgment was rated poor, Dr. Backlund concluded that Jackson could perform one or two-step repetitive tasks. (Tr. at 588-89.) Dr. Backlund found that Jackson was mildly limited in his ability to relate to others and to handle the stresses of daily activities in the work environment. (Tr. at 589.) Dr. Backlund diagnosed Jackson with depressive disorder, not otherwise specified. (Tr. at 589.)

On December 31, 1997, Dr. Grogg reviewed Jackson's file pursuant to a Mental Residual Functional Capacity Assessment and concluded that Jackson was not significantly limited and that he could perform simple tasks. (Tr. at 574-76.) Dr. Grogg assessed Jackson for

5

mental impairments and found depression and a limited IQ score of 68-72. (Tr. at 81-82.) However, Dr. Grogg also found that the severity of these limitations did not satisfy any listed impairment. (Tr. at 585.)

After considering the evidence of Jackson's alleged mental impairment, the State Agency determined Jackson was not disabled because his condition was not severe enough to prevent him from working. (Tr. at 559.) Jackson requested a hearing which was held on October 22, 1998. (Tr. at 79.)

At the hearing, vocational expert Richard Hincks testified that a significant number of jobs existed which could be performed at the light exertional level, with Jackson's several standing, sitting, and other limitations, including semi-skilled jobs at the sedentary exertional level and the job of an addresser, a surveillance monitor, or a hand packager. (Tr. at 35-36.)

After the hearing, Jackson submitted additional evidence to the ALJ to support his alleged mental impairment. (Tr. at 5-23.) Beginning on March 19, 1998, Jackson sought treatment for his depression through Community Mental Health Services. (Tr. at 8.) Jackson presented as homeless and tired, exhibiting poor concentration, a depressed mood, and a flat affect. (*Id.*) He also reportedly "desire[d] to regain SSI." (Tr. at 8-9.) During his admission assessment, Jackson reported that his depression began after he became homeless due to losing his social security benefits. (Tr. at 11.) Felicia Parker, M.S.S.A., a clinician and staff person at the clinic, noted on Axis IV that homelessness was a severe psychosocial stressor for Jackson. (*Id.*) She diagnosed Jackson on Axis I as major depressive, severe, with no features, also noting a current GAF of 60. (*Id.*) When Jackson was referred to a clinic M.D. on March 31, 1998, he complained of long-lasting depression and insomnia partially due to his back pain. (Tr. at 14-15.) Jackson reported a subjective inability to concentrate, but the physician noted that "objectively he has no problems concentrating." (Tr. at 18.) The physician deferred an Axis I and II diagnosis, listed lumbar disc disease and chronic pain syndrome based on medical history, characterized homelessness as a severe psychosocial stressor on Axis IV, and noted a current GAF of 50. (Tr. at 20.) On April 24, 1998, Parker noted that Jackson's mood was somewhat depressed and he had a flat affect. (Tr. at 21.) Parker also noted that he appeared anxious. (Tr.

at 20.) On April 28, 1998, Jackson attended a group and an individual therapy session with the clinic physician. (Tr. at 22.) He fully participated in the group session and complained in his private session that his medication, Trazodone, was too strong. (*Id*.) Jackson did not keep several appointments during May 1998 and his chart was eventually closed due to voluntary withdrawal from the program. (Tr. at 23.) In her closing summary on July 24, 1998, Parker diagnosed Jackson with major depressive disorder, with psychotic features and generalized anxiety disorder. (Tr. at 8.)

On December 16, 1998, the ALJ concluded that Jackson was not disabled because, although he suffered from lumbosacral strain with left lower extremity radiculopathy and dysthymia, he had the residual functional capacity to perform work at the light exertional level with several limitations. (Tr. at 37-38.) Those limitations include: a five minute break for every hour of standing and/or walking; simple one and two-step repetitive tasks only; and occasional stooping. (Tr. at 38.) Climbing, crouching, crawling and operating machinery with left foot controls was prohibited. (*Id*.) The ALJ also found a mild limitation in handling an eight hour work day or changes in a routine work situation. (*Id*.) Jackson appealed the ALJ's unfavorable decision to the Appeals Council. (Tr. at 4.)

In February 2002, Jackson allegedly submitted new evidence to the Appeals Council: treatment records from San Francisco General Hospital ("SFGH") from 1998 to 2000. (Plaintiff's Motion for Summary Judgment "Br." at 5-6.) Jackson visited the emergency room at SFGH on August 30, 1997 complaining of chronic low back pain, and he was given Tylenol with codeine. (Br. at Attachment 1, p. 11-12.) After another SFGH visit on November 8, 1997, Jackson was diagnosed with chronic low back pain, but advised he should not receive his Tylenol refills through the emergency room. (Br. at Attachment 1, p 10.) On July 25, 1998, Jackson was treated for chest pain and diagnosed with clinical rib fractures. (Br. at Attachment 1, p 7-8.) On November 15, 1998, Jackson was again seen at the SFGH emergency room, diagnosed with chronic low back pain, and given Tylenol with codeine and ibuprofen. (Br. at Attachment 1, p. 5-6.) He was advised not to return for medication refills, but told to get involved in an outpatient clinic due to his chronic symptoms. (*Id*.) When Jackson was seen at

7

the SFGH emergency room on March 25, 1999, he complained of back pain and a stiff neck following a car accident. (Br. at Attachment 1, p. 3-4.) He was diagnosed with a left back sprain, a right anttrapeaus sprain, and chronic low back pain. (*Id*.) On July 16, 2000, Jackson was diagnosed with a chest-wall contusion and a right trapezius contusion after being attacked with a baseball bat. (Br. at Attachment 1, p. 1-2, 14-15.)

Jackson allegedly submitted additional new evidence to the Appeals Council: treatment records from Highland Hospital. (Br. at 7.) On March 27, 2000, Dr. Eisenberg noted hypertrophic spurring at multiple levels of Jackson's lumbar spine and recommended an MRI. (Br. at Attachment 2, p. 6.) Dr. Gronner interpreted the subsequent MRI, finding L5-S1 neural foraminal encroachment, greater on the left side, and secondary to facet arthropathy. (Br. at Attachment 2, p. 5.) He also noted protruded central discs at L4-5 and L5-S1 with disc desiccation. (*Id*.) Jackson was referred to the Highland Hospital for an evaluation for a possible epidural injection. (Br. at Attachment 2, p. 3.) On May 23, 2001, Dr. Sanders reviewed Jackson's March 2000 MRI and agreed that there was some bulging of disks at the L4-5 and L5-S1 levels, but found no major spinal canal or foraminal compromise. (Br. at Attachment 2, p. 2.) He diagnosed Jackson with chronic back pain and lumbar spondylosis, noting a general reduction of sensation toward the left side. (*Id*.) Dr. Sanders did not recommend any surgical intervention "given the absence of objective findings." (*Id*.) He also noted that Jackson's back and leg pain were chronic, but not extremely severe. (*Id*.)

The Appeals Council denied receipt of any additional records and denied review on March 22, 2002. (Tr. at 2-3.) Having exhausted his administrative remedies, Jackson filed this action for judicial review of the ALJ's decision and the Appeals Council's final decision in light of new evidence.

## DISCUSSION

**A.     Standard of Review of ALJ's Decision to Deny Social Security Benefits**.

A federal district court may not disturb the ALJ's final decision unless it is based on legal error or the findings of fact are not supported by substantial evidence. 42 U.S.C. § 405(g); *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). "Substantial evidence means more than a

mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). To determine whether substantial evidence exists, courts must look at the record as a whole, considering both evidence that supports and undermines the ALJ's findings. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The ALJ is responsible for determining credibility and resolving conflicts in medical testimony. *Id*. Where the evidence is susceptible to more than one reasonable interpretation, the ALJ's decision must be upheld. *Id*.

**B.     Legal Standard for Establishing a Prima Facie Case for Disability.**

The ALJ follows a five-step sequential evaluation process to determine whether the claimant is disabled. *Id*.; 20 C.F.R. § 416.920. First, the claimant must not be presently engaged in substantial gainful employment. 20 C.F.R. § 416.920(b). Second, the claimant's impairment must be "severe." 20 C.F.R. § 416.920(c). Third, when the claimant has an impairment that meets the duration required and is listed in Appendix 1 (a list of impairments which are presumed severe enough to preclude work located in subpart P of part 404 of 20 C.F.R. § 416.920), or is equal to a listed impairment, benefits are awarded without considering the claimant's age, education, and work experience. 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, all relevant medical and other evidence in the claimant's case record is assessed and findings are made to determine the residual functional capacity[2] of the claimant in order to evaluate whether the claimant can do his or her past work. 20 C.F.R. § 416.920(e). If the claimant is able to do past work, payments are denied. *Id*. Finally, if the claimant cannot continue with past work, the ALJ must determine whether the claimant is able to do any other type of work. 20 C.F.R. § 416.920(f). If the ALJ finds that the claimant is not disabled at any step along the way, the claimant is not disabled and there is no need to continue subsequent steps of the analysis. 20 C.F.R. § 404.1520.

The claimant carries the initial burden of proving disability in steps one through four of the analysis. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, if the claimant

---

[2]Residual functional capacity is the most an individual can do in a work setting despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).

9

establishes that he or she is unable to continue with past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other gainful work. *Id*. Here, the ALJ found that Jackson had the residual functional capacity to perform light exertional level work, with several limitations; therefore at step five of the evaluation process, Jackson was deemed not "disabled."

**C.   The ALJ Properly Considered and Weighed the Evidence Regarding Jackson's Alleged Mental Impairment.**

Jackson claims the ALJ erred by not giving proper weight to evidence that the severity of his impairments render him "disabled." Specifically, Jackson suggests that the 1998 Community Mental Health treatment records should have been given controlling weight.[3]

While a treating physician's opinion normally is afforded great weight in disability cases, that opinion is not necessarily conclusive as to the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). "To reject the opinion of a treating physician [that] conflicts with that of an examining physician, the ALJ must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Id*. (internal quotations omitted). To satisfy this burden, the ALJ must set out a "detailed and thorough summary of the facts and conflicting clinical evidence, [state] his or her interpretation thereof, and [make] findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).

As a preliminary matter, the ALJ permissibly discounted Felicia Parker's 1998 treatment notes in particular. Parker has a M.S.S.A., but is not a physician or psychologist; therefore she

---

[3] Jackson argues that the ALJ failed to consider and properly weigh Felicia Parker's diagnosis of major depressive disorder, with psychotic features and generalized anxiety disorder. (Br. at 5.) However, in his conclusion, Jackson requests summary judgment on the basis that there is substantial evidence that his depression meets or equals the criteria for Affective Disorders in § 12.04 of Appendix 1, the list of impairments presumed severe enough to preclude work. (Br. at 8.) The ALJ specifically evaluated the conflicting evidence of whether Jackson met the threshold criteria for § 12.04. (Tr. at 32-34.) Where there is conflicting evidence, the ALJ may conclude that the listing requirements were not met if those conclusions are based on substantial evidence. *See Lewis v. Apfel*, 236 F.3d 503, 513-14 (9th Cir. 2001). For the reasons discussed herein, substantial evidence exists to support the ALJ's determination that Jackson's depression did not meet or equal a listed impairment; therefore that decision must be upheld. *See Reddick v Chater*, 157 F.3d 715, 720-21 (9th Cir. 1998).

10

is not considered an acceptable medical source to establish her diagnosis of major depressive disorder, with psychotic features and generalized anxiety disorder. *See* 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (identifying licensed or certified psychologists as acceptable medical sources to establish medically determinable impairments). The treatment notes do not suggest she was acting under the supervision of or as an agent of a licensed physician, especially since the clinic physician expressly deferred diagnosis of Jackson. (Tr. at 20.) *Cf. Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996) (holding that nurse practitioner's opinion was properly included in physician's opinion where she worked under close supervision of the physician and worked as an agent of the physician regarding claimant). However, Dr. Backlund, Ph.D., is qualified to state a medical opinion on Jackson's mental disability because he is a licensed psychologist. Therefore the ALJ permissibly accorded Parker's opinion less weight than the contradictory opinions from acceptable medical sources such as Dr. Backlund. *See Gomez*, 74 F.3d at 970-71 (noting that the Code of Federal Regulations does not specify guidelines for weighing opinions from other sources, thereby permitting Commissioner to give opinions from other sources less weight).

      Even if Parker were considered a treating physician, the ALJ set forth specific, legitimate reasons for finding that Jackson's mental impairment was less severe than her diagnosis, and that finding is based on substantial evidence in the record. *See Magallanes*, 881 F.2d at 751. In *Magallanes*, the ALJ rejected two treating physicians' opinions regarding the onset date of the claimant's disability. 881 F.2d at 751-52, 754. The ALJ gave more weight to the opinions and evidence of four other doctors' findings against disability, but relied primarily on an examining physician, Dr. Auerbach. *Id*. at 751-52. Dr. Auerbach reviewed the claimant's medical records and found that the claimant could return to work with certain restrictions, which were consistent with other "objective signs and findings in the medical evidence." *Id*. at 752. The ALJ specifically found that there was consistent evidence predating Dr. Auerbach's report to support his finding that the claimant could walk, sit and stand with mild to no difficulty. *Id*. The Ninth Circuit concluded that the ALJ's thorough summary of the conflicting evidence, in additional to his specific and legitimate explanations for his interpretation and findings, were supported by

1  substantial evidence in the record and therefore met the standard for discrediting the treating
2  physicians' opinions. *Id*. at 754, 755.
3  　　　Here, as in *Magallenes*, the ALJ summarized the conflicting evidence about the severity
4  of Jackson's mental impairments. (Tr. at 30-31.) The ALJ rejected Dr. Neill's consultative
5  opinion that Jackson suffered from major depression, severe and was unable to attend to daily
6  life activities because these conclusions were "in excess of the findings and were inconsistent
7  with the claimant's lifelong accomplishments." (Tr. at 36.) For example, the ALJ specifically
8  noted claimant's past work as a certified nurse's assistant, his presentation at the hearing as a
9  "savvy ex-Marine," and his report of several daily activities to Dr. Backlund. (Tr. at 33.) The
10 ALJ also considered the Community Mental Health Services treatment records, but emphasized
11 Jackson's expressed desire to regain benefits, his failure to keep appointments and his voluntary
12 withdrawal from the program. (Tr. at 31.) The ALJ primarily relied on the report of Dr.
13 Backlund, an examining psychologist who diagnosed Jackson with a depressive disorder, not
14 otherwise specified, but also concluded that Jackson could perform one to two-step repetitive
15 tasks and was only mildly socially limited. (Tr. at 36, 588-89.) Dr. Backlund's opinion was
16 based on the review of available records, a clinical interview, and several administered tests,
17 which he indicated were suspect due to intentional deception. (Tr. at 588-89.) Dr. Backlund's
18 assessment that Jackson was able to follow instructions and maintain the appropriate level of
19 concentration, pace and persistence necessary to perform simple tasks is consistent with the
20 Community Mental Health Services treating physician's note that, objectively, Jackson had no
21 problem concentrating. (Tr. at 18, 589.) The treating physician, aware of Parker's initial
22 diagnosis of major depressive, severe, deferred diagnosis. (Tr. at 20.) Dr. Grogg's conclusion
23 that Jackson was not significantly limited in performing simple tasks also supports Dr.
24 Backlund's evaluation. (Tr. at 574-76.) Therefore, substantial evidence supports the ALJ's
25 decision to credit Dr. Backlund's opinions. The ALJ is empowered to determine credibility and
26 resolve conflicting medical testimony, and that he did so here to Jackson's detriment does not
27 constitute error. The Court finds that the ALJ set forth specific, legitimate reasons based on
28 substantial evidence to support his finding.

**D.     The New Evidence is Not Material Because There Is No Reasonable Possibility That It Would Have Changed the Outcome of the ALJ's Decision.**

Jackson argues that the SFGH and Highland Hospital records allegedly submitted to the Appeals Council in February 2002, which the Appeals Council denies receiving, constitute new evidence that justifies remand.[4]

A district court may review the Commissioner's final decision in light of new evidence submitted by the claimant to determine whether the case should be remanded for reconsideration. 42 U.S.C. § 405(g). Such new evidence must be material: "bearing directly and substantially on the matter in dispute." *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001) (citations omitted). To be considered material, there must be a "reasonable possibility that the new evidence would have changed the outcome of the administrative hearing." *Mayes*, 276 F.3d at 462 (citations omitted). Also, if the new evidence was not submitted in a proceeding prior to the commencement of the civil action, the claimant must show good cause for failing to submit the evidence earlier. 42 U.S.C. § 405(g); *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985).

The new evidence from SFGH does not meet the materiality requirement. The SFGH treatment records from August 30, 1997, November 8, 1997, November 15, 1998, and March 25, 1999 are directly related to the ALJ's disability determination regarding Jackson's physical impairments, but they do not substantially bear on the disputed matter: the severity of Jackson's back injuries.[5] In finding that Jackson suffered from lumbosacral strain with left lower extremity radiculopathy which was "severe," but not ultimately "disabling," the ALJ relied on Dr. Anderson's opinion that Jackson suffered from chronic pain syndrome due to a lumbosacral

---

[4] Even if the Appeals Council had received the new evidence with the request for review, the Appeals Council shall only consider material evidence that relates to the period on or before the date of the ALJ's decision. *See* 20 C.F.R. §§ 404.970(b), 416.1470(b); *Bates v. Sullivan*, 894 F.2d 1059, 1064 (9th Cir. 1989) (overruled in part on other grounds). Jackson's new evidence does not meet the materiality requirement, for the reasons discussed herein.

[5] The July 16, 2000 SFGH treatment record involves intervening chest-wall injuries from an assault that is not directly related to this matter. (Br. at Attachment 1, p. 1-2, 14-15.)

sprain or lumbar facet syndrome. (Tr. at 37-38, 540.) This opinion is specifically supported by Dr. Sharma's previous finding that Jackson's low back pain was due to a musculoskeletal strain and muscle spasm. (Tr. at 290.) The SFGH physicians consistently diagnosed Jackson with chronic low back pain and only prescribed Tylenol #3 with codeine as pain medication. (Attachment 1, p. 5-6, 10-12.) This new evidence undermines Jackson's claim that his injuries are more severe than the ALJ's findings, leaving no reasonable possibility that it would change the outcome of the ALJ's decision.

Similarly, the new evidence from Highland Hospital does not meet the materiality requirement. In his March 27, 2000 report, Dr. Gonner reviewed an MRI of Jackson's back and noted L5-S1 neural foraminal encroachment, greater on the left side and second to facet arthropathy. (Attachment 2, p.5.) However, this impression was already before the ALJ by way of Dr. Keller's similar findings. (Tr. at 205.) While this new report could support Jackson's claim that his back pain is disabling, the ALJ had also already considered Dr. Lincoln's report, nothing that up to one-third of the normal population in Jackson's age group, with no history of low back pain, would reveal similar results on an MRI. (Tr. at 224.) Additionally, the subsequent Highland Hospital report by Dr. Sanders conflicts with Dr. Gonner's diagnosis. (Attachment 2, p. 1-2.) Dr. Sanders reviewed the March 2000 MRI and agreed that there was some bulging of disks at the L4-5 and L5-S1 levels, but found no major spinal canal or foraminal compromise. (Attachment 2, p. 2.) Instead, Dr. Sanders diagnosed Jackson with chronic back pain and lumbar spondylosis, noting a general reduction of sensation toward the left side. (*Id*.) He also noted that Jackson's pain was chronic, but not extremely severe, and cited an "absence of objective findings." (Attachment 2, p. 1-2.) This opinion is consistent with the ALJ's findings; therefore the Highland Hospital new evidence is not likely to have changed the outcome of the ALJ's decision.

Because this Court finds that the new evidence submitted by Jackson is not material because it is not reasonably likely to have changed the outcome of the ALJ's decision, it is unnecessary to address the good cause requirement.

14

**CONCLUSION**

For the foregoing reasons, the Court hereby DENIES Jackson's Motion for Summary Judgment and GRANTS the Commissioner's Cross-Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: August 12, 2005

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE